IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN BREITENFELD,         ) | |
|               ) | |
|   Plaintiff,         ) | |
|               ) | |
| v.              ) | Case No: 19-cv-537 |
| PERRY'S RESTAURANT LIMITED &   ) | |
| PERRY'S STEAKHOUSE OF ILLINOIS, LLC,  ) | |
| D/B/A PERRY'S STEAKHOUSE & GRILLE and  ) | |
| JEFFREY PAGNOTTA      ) | |
|               ) | |
|   Defendant.        ) | |

## <u>COMPLAINT</u>

Plaintiff, SUSAN BREITENFELD, by and through her attorneys, the Law Offices of Colleen M. McLaughlin, and Osborne Employment Law LLC complains of PERRY'S RESTAURANT LIMITED ("PRL"), and PERRY'S STEAKHOUSE ILLINOIS, LLC ("PSI") (collectively, "Perry's" or "Defendants,") and JEFFREY PAGNOTTA ("Pagnotta") and states as follows:

## <u>INTRODUCTION</u>

1. Plaintiff, Ms. Breitenfeld ("Plaintiff" or "Breitenfeld") alleges that her former employer Perry's has violated Title VII of the Civil Rights Act, 42 U.S.C. 2000e-2, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §12112 *et. seq* ("ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2611 *et. seq* ("FMLA"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 ("IWPCA").

## JURISDICTION AND VENUE

2.      On December 22, 2016, Plaintiff timely filed a Charge of Discrimination on the basis of gender, disability, and retaliation with the Equal Employment Opportunity Commission ("EEOC"). After she was discharged from her employment, on January 24, 2017, Plaintiff timely filed an amended Charge of Discrimination with the EEOC. See Group Exhibit A, attached hereto.

3.      On June 18, 2018, the EEOC issued a Right to Sue Notice (the "Notice") to Plaintiff after making a finding of reasonable cause to believe that HSBC had violated Title VII and conciliation efforts failed. See Exhibit B, attached hereto.

4.      The parties entered into several tolling agreements which extended the 90-day time period for the timely filing of this Complaint to January 25, 2019. This lawsuit has been filed within the extended time period. See, Exhibit C attached hereto.

5.      This Court may exercise federal question jurisdiction over the claims made pursuant to Title VII, the ADA, and the FMLA under the 28 U.S.C. §1331.

6.      In addition, this Court has supplemental jurisdiction over the claims made under the IWPCA pursuant to 28 U.S.C. §1367.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and § 1391(c) because the acts and omissions giving rise to the cause of action arose and occurred in the Northern District of Illinois.

## PARTIES

8.      Ms. Breitenfeld is a resident of Illinois and a former employee of Defendants.

9.     PRL is a Limited Liability partnership with its principal place of business located at 9805 Katy Freeway, Suite 650, Houston Texas, 77024. It is the parent company for all Perry's Steakhouse & Grille Restaurants located in Texas, Illinois, Alabama, and Colorado.

10.     PSI is a Limited Liability Company and a wholly owned subsidiary of PRL. It operates a Perry's Steakhouse & Grille Restaurant located at 5 Oakbrook Center, Oak Brook, Illinois, 60523 ("Perry's Oakbrook").

11.     PSI's corporate office is PRL's corporate office in Houston Texas. PSI "headquarters" is staffed exclusively by PRL employees. All corporate management of PSI is conducted through PRL employees from PRL headquarters in Texas. Most administrative functions for PSI are done by or run through PRL; for example, PSI's Human Resources Department is PRL's Human Resources Department and payroll information is first sent by PSI to PRL's Payroll Department, prior to PRL sending payroll information on to a third- party vendor.

**FACTS**

12.     The General Manager ("GM") of the Perry's Oakbrook reports directly to either a PRL Regional Manager or the Director of Operations at PRL.

13.     Ms. Breitenfeld was diagnosed with Complex Regional Pain Syndrome ("CRPS") in or about April 2013.

14.     CRPS is a chronic pain condition caused by damage or malfunction of the nervous system and characterized by prolonged or excessive pain.

15.     Ms. Breitenfeld began working for Perry's Oakbrook in or about April 2014 as a Server. Her duties included, but were not limited to, serving food and beverages to guests, and ensuring that their dining experience was well-timed and pleasant.

16.     In or about August 2014, Ms. Breitenfeld underwent a surgical procedure related to her CRPS. She informed management of her condition and requested time off.

17.     On or about the day before her surgery was scheduled in August 2014, Ms. Breitenfeld collapsed at Perry's Oakbrook Restaurant. GM at the time Howard Cortes ("Cortes") physically lifted her up from the floor and commented that he did not realize her condition was so severe.

18.     In or about December 2014, Ms. Breitenfeld required another surgical procedure related to her CRPS and requested time off.

19.     At the end of October 2014, Cortes became a Regional Manager at PRL and Assistant GM Jeff Pagnotta ("Pagnotta") was promoted to GM. Pagnotta was upset with Ms. Breitenfeld for requesting time off during the 2014 holiday season. Ms. Breitenfeld did not take the full 3 days off work her doctor recommended after her procedure.

20.     On or about Sunday, May 10, 2015, Ms. Breitenfeld fell over a glass rack at Perry's Oakbrook. GM Pagnotta ordered fellow coworker and daughter of Ms. Breitenfeld, Sydney Breitenfeld, to get Ms. Breitenfeld's prescription pain medication from Ms. Breitenfeld's car.

**Facts as to Actionable Claims**

21.     On or about August 20 and 28 of 2016, Ms. Breitenfeld inadvertently ingested grapefruit juice before her shifts which reacted negatively with her medication. On both occasions, she became physically ill and Assistant GM Josh Nabors ("Nabors") sent her home.

22.     On August 28, 2016, Pagnotta wrote up a "Coaching and Counseling" form on Ms. Breitenfeld for her absences on August 20 and 28, 2016. This document was never presented to Ms. Breitenfeld.

23.     Instead, on August 28, 2016, Mr. Pagnotta sent an e-mail to Human Resources Manager Adriana Garcia ("Garcia") at 4:23 p.m., 2 hours before Ms. Breitenfeld went home for her illness that day. Garcia was a PRL employee working out of the corporate headquarters in Houston, Texas.

24.     In the August 28, 2016 e-mail to Garcia, Pagnotta informed Garcia that Ms. Breitenfeld told him she was not feeling well and that she thought she might have cancer. Ms. Breitenfeld also told him that it hurt to swallow and was eating bread because she was losing weight and it was all that she could keep down. Pagnotta said that he offered to look into accommodating Ms. Breitenfeld's scheduling, as he knew that she did not have time to eat between her multiple jobs. Pagnotta also informed Garcia that Ms. Breitenfeld had gone home early for illness two Saturdays ago, but was able to work all of her shifts during the past week.

25.     On the morning of August 29, Garcia forwarded Pagnotta's e-mail to Monica Scott of the Human Resources consulting firm Achilles Group, used by Defendants. In that e-mail, Garcia asked Ms. Scott to "talk this one through."

26.     On September 1, 2016, instead of a counseling form, Pagnotta presented Ms. Breitenfeld with a written warning for missing work on August 20 and 28, 2016. Ms. Breitenfeld protested the write-up because Pagnotta knew she was sick because of her CRPS and the medications she was on.  Pagnotta denied knowing about Ms. Breitenfeld's condition and medications, and demanded she provide him with her doctor's contact information.

27.     Ms. Breitenfeld started to give the information but stopped and told Pagnotta that his asking to contact her doctor was illegal and a violation of the Health Insurance Portability and Accountability Act ("HIPAA"). She told Pagnotta she would be contacting HR and her lawyer.

28.     After her shift on the evening of September 1, 2016, Ms. Breitenfeld called Regional Manager Cortes and explained the situation with Pagnotta. Cortes advised Ms. Breitenfeld to call Garcia in HR.

29.     The following day, September 2, 2016, Ms. Breitenfeld contacted Garcia. Ms. Breitenfeld reported that Pagnotta was writing her up for taking time off due to her disability. Ms. Breitenfeld informed Ms. Garcia of her medical condition, and of Mr. Pagnotta's request for doctor information.  Garcia did not know anything about HIPAA and Ms. Breitenfeld had to explain that she had privacy rights under HIPAA that Pagnotta was trying to violate.

30.     Ms. Breitenfeld also informed Garcia that she and other female employees at Perry's Oakbrook Restaurant were being sexually harassed by a busser, Arturo Ortega ("Ortega"). She informed Garcia about Ortega's multiple text messages, his attempts to hold her hands, and his refusal to help her in the workplace because of her rejections. Garcia said that this was the first she had heard about harassment from Ortega at Perry's Oakbrook Restaurant.

31.     On the September 2, 2016 phone call with Garcia, Ms. Breitenfeld also reported that she was concerned that Pagnotta would retaliate against her because of previous incidents involving a hostess, former employee Allison Fergesen ("Ms. Fergesen").

32.     Upon information and belief, Ms. Fergesen complained to Pagnotta in early 2016 about being sexually harassed by Ortega. Pagnotta gave Ms. Fergesen a pork chop (Perry's signature dish) and told her to forget about the harassment. Ms. Fergesen was then subjected to increased scrutiny in the workplace and ultimately fired for some petty incident. Ms. Breitenfeld told Ms. Garcia that because of this incident, her coworkers were afraid to come forward about harassment, and she and others feared retaliation from Pagnotta.

33.     Ms. Breitenfeld also informed Garcia that she was concerned she would be similarly set up and relayed how Pagnotta was upset about her taking time off for surgery during the busy holiday season back in 2014.

34.     Despite being informed directly by Ms. Breitenfeld about her disability, Garcia did not inform Ms. Breitenfeld about her rights under the ADA, HIPAA, or the FMLA. Garcia did not provide Ms. Breitenfeld with any ADA or FMLA forms for her doctor to fill out. Instead, Garcia informed Ms. Breitenfeld that Defendants had a right to her medical records, and that if necessary, Defendants could take legal action to obtain them.

35.     Upon information and belief, no subsequent action was taken by Perry's to address Ms. Breitenfeld's reports and concerns about the discrimination, retaliation, and harassment she was experiencing.

36.      The next day, September 3, 2016, at 1:04 p.m., Pagnotta sent Garcia a follow-up e-mail informing her that he met with his team about "managing Susan." Pagnotta also stated

that some on his team described Ms. Breitenfeld as "somewhat sluggish, lethargic, defensive, confused, overly verbose and can slur words (mumble) at times."

37.     In this e-mail, Pagnotta also reported Ms. Breitenfeld for making a sexually harassing comment to one of her managers, Kristine Nolte ("Nolte").

38.     Upon information and belief, Pagnotta pressured Nolte into making a harassment complaint against Ms. Breitenfeld.

39.     On or about September 10, 2016, Ms. Breitenfeld was counseled for the alleged harassment against Nolte.

40.     After Ms. Breitenfeld made her report to HR, in the fall and winter of 2016, Ms. Breitenfeld routinely was assigned fewer guests to serve, given the worse sidework assignments and had her scheduled in such a way as to lower her income. On information and belief, these actions were instigated by Pagnotta and Nabors. As a result, Ms. Breitenfeld complained to her managers, and eventually directly to GM Pagnotta.

41.     On October 27, 2016, Pagnotta gave Ms. Breitenfeld a written warning for a "severe" guest complaint. During the presentation of this write-up, Pagnotta again demanded her doctor information, which Ms. Breitenfeld refused. This write-up was designated as Ms. Breitenfeld's "second warning," even though to Ms. Breitenfeld's knowledge it was her first write-up for a "severe" guest complaint.

42.     On November 26, 2016, Ortega intentionally touched Ms. Breitenfeld's breast without her consent. She reported this to Assistant GM Nabors and his only response was, "Great! More drama."

43. On or about December 4, 2016, another incident occurred in which Ortega refused to leave Ms. Breitenfeld alone in the women's restroom. Again, she complained to Assistant GM Nabors. Nabors again responded with, "Great! More drama."

44. On or about December 8, 2016, Pagnotta opened the women's restroom door on Ms. Breitenfeld to yell at her, and then followed her on her shift to criticize her work, despite guests she was serving telling him that everything was going well.

45. On or about December 9, 2016, Pagnotta asked probing questions of Ms. Breitenfeld's guests, attempting to elicit criticisms.

46. On or about December 12, 2016, Ortega harassed Ms. Breitenfeld again, grabbing her hand and telling her that he loved her. When Ms. Breitenfeld told him to stop, he only laughed and said that he could do whatever he wanted. Ms. Breitenfeld reported this and the previous behavior to Manager Nolte. Nolte referred the complaint to Manager Jair Soberanis ("Soberanis"), who could speak to Ortega about the complaint in Spanish. Nolte later informed Ms. Breitenfeld that Soberanis did not think much of her complaint.

47. On or about December 15, 2016, Pagnotta again opened the door to the women's restroom to yell at Ms. Breitenfeld over an alleged problem that did not exist. Again, on that day he followed her on her shift and was critical of her work.

48. On December 17, 2016, Ms. Breitenfeld sent an e-mail to Garcia reporting the harassment by Ortega, the inaction by her managers to her complaints, and the retaliation by Pagnotta. Ms. Breitenfeld also informed Garcia that she would be contacting the EEOC.

49.     On or about the afternoon of December 17, 2016, Pagnotta and Nabors spoke privately with Ms. Breitenfeld about her written complaint to HR and said that they had "no idea" that Ortega had been harassing her or other female servers.

50.     On information and belief, on December 17, 2016 Pagnotta fired Ortega at the direction of HR.

51.     In or about her last week of employment at Perry's Oakbrook, Ms. Breitenfeld learned that Pagnotta and Nabors were talking about firing Ms. Breitenfeld as soon as possible and/or making her life so miserable, by giving her bad assignments, that she would quit.

52.     On December 19, 2016, Garcia and Ms. Breitenfeld had a telephone conversation. Garcia asked Ms. Breitenfeld why she hadn't come to her instead of filing with the EEOC. Ms. Breitenfeld informed Garcia that she had come to her, she felt her complaints were being ignored and that she had no other option but to go to the EEOC. Garcia denied that Pagnotta was retaliating against or trying to get rid of Ms. Breitenfeld, and instead told her that Pagnotta held her on a pedestal.

53.     On the same day, Ms. Breitenfeld also lodged a complaint, to Manager Soberanis, against server Steve Pottle ("Pottle") who, on information and belief, was purposely delaying her check out that evening on orders from Pagnotta or one of the other managers. That complaint of harassment went up the chain to Pagnotta.

54.     On December 21, 2016, Pottle reported Ms. Breitenfeld for taking down the Sidework Assignment Chart that is posted daily in the kitchen, photographing it and putting it back.

55.     On December 23, 2016, Pagnotta terminated Susan for "a severe guest complaint received on Wednesday, December 21, 2016" concerning service Ms. Breitenfeld rendered on Sunday, December 18, 2016. When asked for details regarding the complaint, Pagnotta refused to share any details other than the date of service, and the allegation that Ms. Breitenfeld was "mean" and "incredibly rude." Ms. Breitenfeld does not recall having any negative interactions with guests during that shift.

## COUNT 1: ADA EMPLOYMENT DISCRIMINATION
## AGAINST DEFENDANTS PRL & PSI

56.     Plaintiff re-alleges and restates paragraphs 1-55 as if fully set forth herein.

57.     Plaintiff was an "employee" as defined by the ADA. 42 U.S.C. § 12111(4).

58.     Defendants PRL and PSI are "employers" as defined by the ADA. 42 U.S.C. § 12111(5).

59.     Plaintiff, Susan Breitenfeld, is an individual with a disability as defined by the ADA. 42 U.S.C. § 12102 (1).

60.     The Defendants were on notice that Plaintiff was a disabled individual as defined by the ADA from at least August 2014.

61.     From August 2014 forward, Defendants failed to engage in the interactive process with Ms. Breitenfeld, which they had an obligation so to do under the ADA, to determine an appropriate accommodation for Ms. Breitenfeld's disability.

62.     In late August 2016, Ms. Breitenfeld was visibly ill from the effects of her CRPS and medications, and informed Pagnotta that her symptoms were so bad that she believed she might have cancer.  Defendants had an obligation under the ADA at that time to engage in the

interactive process with Ms. Breitenfeld to determine an appropriate accommodation, but they did not do so.

63. Also in late August 2016, when it was reported to GM Pagnotta and HR that Ms. Breitenfeld was often sluggish, lethargic, confused, and could slur words at time, Defendants had an obligation under the ADA to engage in the interactive process with Ms. Breitenfeld to determine an appropriate accommodation, but they did not do so.

64. Instead, Defendants embarked on a campaign to harass her, demand her doctor's contact information in a manner strictly prohibited by federal law, attempt to create a paper trail that would justify termination through unwarranted discipline and generally make her life at Perry's Oakbrook so miserable she would quit if they did not find a way to terminate her first.

65. The actions described above in paragraphs 21-55 and paragraphs 61-64 constitute discrimination against Plaintiff within the meaning of the ADA.

66. The actions of Defendants were intentional, willful, and malicious and/or in deliberate indifference for Plaintiff's rights.

67. The actions of the Defendants against Plaintiff have caused her great mental anguish, emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other damages.

**WHEREFORE**, Plaintiff, Susan Breitenfeld, respectfully prays that this Court enter an order granting Plaintiff the following relief:

- a. Reinstatement, or alternatively front pay;
- b. Back-pay;
- c. Actual damages incurred as a result of the discrimination;
- d. Punitive damages;

e.  Pre Judgment interest;
f.  Post Judgment interest;
g.  Litigation costs;
h.  Reasonable attorney's fees; and
i.  Such other and further relief as may be just in law and in equity.

### COUNT 2: ADA RETALIATION AGAINST DEFENDANTS PRL & PSI

68.  Plaintiff re-alleges and restates paragraphs 1-59 as if fully set forth herein.

69.  Between August 2016 and the time she was terminated on December 23, 2016, Ms. Breitenfeld complained numerous times to numerous sources about the discrimination, harassment and retaliation she was experiencing and Defendants failed to investigate and take appropriate remedial measures.

70.  Instead, Defendants embarked on a campaign to further harass her, demand her doctor's contact information in a manner strictly prohibited by federal law, attempt to create a paper trail that would justify termination through unwarranted discipline and generally make her life at Perry's Oakbrook so miserable she would quit. However, Defendants ultimately contrived a reason to terminate her employment.

71.  Defendants' actions constitute retaliation against Plaintiff within the meaning of the ADA.

72.  The actions of Defendants were intentional, willful, and malicious and/or in deliberate indifference for Plaintiff's rights.

73.  The actions of the Defendants against Plaintiff have caused her great mental anguish, emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other damages.

**WHEREFORE**, Plaintiff, Susan Breitenfeld, respectfully prays that this Court enter an order granting Plaintiff the following relief:

    a.  Reinstatement, or alternatively front pay;
    b.  Back-pay;
    c.  Actual damages incurred as a result of the discrimination;
    d.  Punitive damages;
    e.  Pre Judgment interest;
    f.  Post Judgment interest;
    g.  Litigation costs;
    h.  Reasonable attorney's fees; and
    i.  Such other and further relief as may be just in law and in equity.

## COUNT 3: TITLE VII GENDER DISCRIMINATION – HARASSMENT – HOSTILE WORK ENVIRONMENT AGAINST DEFENDANTS PRL & PSI

74.    Plaintiff re-alleges and restates paragraphs 1-55 as if fully set forth herein.

75.    Plaintiff was an "employee" as defined by Title VII. 42 U.S.C. § 2000e (f).

76.    Defendants Perry's are "employers" as defined by Title VII. 42 U.S.C. § 2000e (b).

77.    Beginning on or around September, 2016, and continuing through Plaintiff's termination on December 23, 2016, Defendants discriminated against Plaintiff in the terms, conditions, and privileges of employment because of her gender, in violation of Title VII, and specifically:

    (a)    Defendants, through its employee, Arturo Ortega, subjected Plaintiff to unwanted harassment of a sexual nature.

(b)　　Defendants, by and through its agents, supervisors, or employees, knew or should have known of the unwelcome verbal and physical conduct of a sexual nature, and discrimination by its employee Arturo Ortega, which created an intimidating, hostile, or offensive work environment for Plaintiff and failed to take appropriate remedial measures.

(c)　　The Defendants, by and through its agents, supervisors, or employees, gave male servers preferential treatment with respect to discipline, in tables and guests assignments, allowing them to make more money than Plaintiff because of her gender.

78.　　The foregoing acts and conduct by agents, supervisors, or employees of Defendants at Defendants' place of business were unwelcome to Plaintiff and unreasonably interfered with Plaintiff's work performance and seriously affected her psychological well-being.

79.　　The actions described herein constitute gender discrimination, harassment, and create a hostile work environment within the meaning of the Title VII.

80.　　The actions of Defendants were intentional, willful, and malicious and/or in deliberate indifference for Plaintiff's rights.

81.　　The actions of the Defendants against Plaintiff have caused her great mental anguish, emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other damages.

**WHEREFORE**, Plaintiff, Susan Breitenfeld, respectfully prays that this Court enter an order granting Plaintiff the following relief:

a. Reinstatement, or alternatively front pay;
b. Back-pay;
c. Actual damages incurred as a result of the discrimination;
d. Punitive damages;
e. Pre Judgment interest;
f. Post Judgment interest;
g. Litigation costs;
h. Reasonable attorney's fees; and
i. Such other and further relief as may be just in law and in equity.

## COUNT 4: TITLE VII RETALIATION AGAINST DEFENDANTS PRL & PSI

82. Plaintiff re-alleges and restates paragraphs 1-81 as if fully set forth herein.

83. After the reports of discrimination, harassment, and retaliation, Ms. Breitenfeld was routinely assigned fewer guests to serve, given tougher sidework assignments, had fewer scheduled hours which lowered her income, and eventually was terminated on December 23, 2016.

84. The actions described herein constitute retaliation against Plaintiff within the meaning of the Title VII.

85. The actions of Defendants were intentional, willful, and malicious and/or in deliberate indifference for Plaintiff's rights.

86. The actions of the Defendants against Plaintiff have caused her great mental anguish, emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other damages.

**WHEREFORE**, Plaintiff, Susan Breitenfeld, respectfully prays that this Court enter an order granting Plaintiff the following relief:

a. Reinstatement, or alternatively front pay;
b. Back-pay;
c. Actual damages incurred as a result of the discrimination;
d. Punitive damages;
e. Pre Judgment interest;
f. Post Judgment interest;
g. Litigation costs;
h. Reasonable attorney's fees; and
i. Such other and further relief as may be just in law and in equity.

## COUNT 5: FMLA INTERFERENCE AND RETALIATION

87. Plaintiff incorporates paragraphs 1-55 as though fully re-stated and set forth herein.

88. Plaintiff was an "eligible employee" under the FMLA, 29 U.S.C. § 2611 (2).

89. Defendants are "employers" as defined under the FMLA, 29 U.S.C. § 2611 (4).

90. Plaintiff has a "serious health condition" as defined under the FMLA, 29 U.S.C. § 2611 (11), which would entitle her to up to 12 weeks time off annually, including intermittent time off, when necessary to deal with symptoms of her health condition.

91. Defendants had notice of Plaintiff's serious health condition as of August 2014.

92. Alternatively, Defendants had notice of Plaintiff having a serious health condition as of August 28, 2016.

93. Despite their knowledge of Plaintiff's serious health condition and her apparent need for time off to address it, in September 2016 Defendants did not offer her Family Medical Leave.

94. Defendants interfered with Plaintiff's rights under the FMLA by failing to inform her of her ability to take time away from work to address her serious health condition.

95.     In addition, Defendants directly violated 29 CFR § 825.307(a), by having her direct supervisor, Pagnotta, ask Ms. Breitenfeld for her doctor's information so that he might contact the doctor directly.

96.     Plaintiff suffered an adverse employment action, i.e. disciplinary action and termination in retaliation for using her statutorily protected FMLA right to leave because of a serious health condition that made her unable to perform her work and complaining about having received discipline for taking this time off.

97.     The actions of Defendants were intentional, willful, and malicious and in deliberate indifference for Plaintiff's rights.

98.     As a result of Defendants' wrongful actions, Plaintiff has suffered lost wages and other employment benefits, emotional distress, and other damages.

**WHEREFORE,** Plaintiff, Susan Breitenfeld, respectfully requests that this Court award all monetary and non-monetary amounts available under law including but not limited to:

a.  Lost wages and benefits including back pay;
b.  Reinstatement to the same or an equivalent position or front pay;
c.  Actual damages;
d.  Pre Judgment interest on all amounts awarded;
e.  Post Judgment interest on all amounts awarded;
f.  Liquidated damages;
g.  Litigation costs;
h.  Reasonable attorney's fees;
i.  All other such relief as may be just in law and in equity.


### COUNT 6: IWPC RETALIATION AGAINST ALL DEFENDANTS

99.     Plaintiffs hereby re-allege and incorporate paragraphs 1-12 and 51 and 53-55 of this Complaint.

100.     Plaintiff was an "employee" as defined by the IWPCA, 820 ILCS §115/2.

101.    Defendant PSI is an "employer" as defined by the IWPCA, 820 ILCS §115/2.

102.    Defendant PRL is an "employer" as defined by the IWPCA, 820 ILCS §115/2.

103.    Defendant Pagnotta is an "employer" as defined by the IWPCA, 820 ILCS §115/2.

104.    On October 29, 2014, a class action/collective lawsuit was filed on behalf of all Servers who worked at Perry's Oakbrook from November 2013 to present, in the Northern District of Illinois. The case is currently pending before Judge Durkin. See *Jessica Berger et al v. Perry's Steakhouse of Illinois et al,* 14 c 8543.

105.    The complaint alleges, among other claims, failure to properly pay Servers under the Fair Labor Standards Act, 29 USC §201 *et seq*., the Illinois Minimum Wage Act, 820 ILCS 105/1 *et seq*., and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*. One of the specific claims involves failure to properly pay the class of servers while they are performing opening and closing sidework.

106.    GM Pagnotta is one of the named Defendants in that class action lawsuit.

107.    Plaintiff opted into the class on September 30, 2016. Ms. Breitenfeld's Opt-in is public record. See, 14 c 8543, Dkt. 163-164.

108.    On information and belief, in or about early October 2016, Pagnotta and other members of PRL/PSI management became aware of Plaintiff becoming an opt-in plaintiff in the class action/collective lawsuit.

109.    Alternatively, Pagnotta and other members of PRL/PSI management became aware of Plaintiff becoming an opt-in plaintiff in the class action/collective lawsuit on or about December 21, 2016, that Plaintiff was assisting counsel in the class action/collective lawsuit by photographing Perry's Sidework Assignment Chart.

110.     Defendants have unlawfully discriminated and retaliated against Plaintiff for her complaining about wages and assisting in the class action lawsuit in violation of Section 14 the IWPCA, 820 ILCS 115/14(c).

111.     Defendants actions were intentional, malicious. willful and in reckless disregard of Plaintiff's rights under the IWPCA.

WHEREFORE, Plaintiff, Susan Breitenfeld, respectfully requests that the Court enter judgment against Defendants for the following relief:

     a. Back pay;
     b. Reinstatement or front pay;
     c. Prejudgment interest (815 ILCS §205(2));
     d. Statutory penalty damages (820 ILCS §115/14);
     e. Reasonable attorneys' fees and costs (820 ILCS §115/14); and
     f. All such other relief as this Court deems just.

Dated: January 25, 2019

Respectfully submitted by:

/s/ Colleen M. McLaughlin
Attorney for Plaintiff

Colleen M. McLaughlin
Law Offices of Colleen M. McLaughlin
1751 S. Naperville Rd., Ste. 209
Wheaton, Illinois 60189
Telephone: (630) 221-0305
colleen@cmmc-employmentlaw.com
ARDC 3127466

Quinton Osborne
Osborne Employment Law
1751 S. Naperville Rd.  Ste 209
Wheaton, IL 60189
630-221-0305
quinton@osborneemploymentlaw.com